UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FELICIA JENKINS       )  | 3:22-cv-01289 (KAD) |
| *Plaintiff*,          )  | |
|                       )  | |
| v.                    )  | |
|                       )  | |
| CITY OF HARTFORD ET AL.  ) | MARCH 18, 2024 |
| *Defendants*.         )  | |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT THODY'S MOTION TO DISMISS (ECF NO. 25)**

Kari A. Dooley, United States District Judge:

This civil rights action arises out of the arrest and detention of Plaintiff Felicia Jenkins ("Plaintiff" or "Jenkins") by Hartford Police Department (HPD) officers on March 14–15, 2021. Plaintiff brings this action pursuant to 42 U.S.C. Section 1983 alleging, *inter alia,* that the defendants used excessive force while Plaintiff was detained at the HPD.[1] Plaintiff brings four claims against the City of Hartford ("the City") and Chief Thody, who is sued in his official capacity.[2] Pending before the Court is the City's and Chief Thody's motion to dismiss count one (excessive force – U.S. Constitution), count two (equal protection under 42 U.S.C. Section 1981) count seven (excessive force – Connecticut Constitution) and count twelve (Indemnification under Conn. Gen. Stat. § 7-465) which Plaintiff opposes, in part. For the reasons that follow, the motion is GRANTED.

**Standard of Review**

---

[1] Plaintiff names Officers Guzie, Samuels, Mebane, Baerga, Contreras and Cohen as defendants in addition to Chief Thody and the City of Hartford. Plaintiff's original complaint also named the Hartford Police Department as a defendant. However, the HPD was not named in Plaintiff's Amended Complaint or Second Amended Complaint and was therefore terminated as a defendant on June 13, 2023.

[2] Although Chief Thody also seeks dismissal of claims brought against him in his individual capacity insofar as Plaintiff has not alleged his direct personal involvement in the constitutional violations, *see* Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 25-1 at 16, the Second Amended Complaint clearly states that Chief Thody is sued in his official capacity only. Second Am. Compl., ECF No. 23 at 3 ¶ 6.

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Allegations**

On or about the late evening / early morning hours of March 14–15, 2021, Plaintiff, a Hartford resident, was in HPD custody following a domestic matter. Second Am. Compl. ("SAC"), ECF No. 23, at 4 ¶ 12. At some point, Plaintiff was in the HPD processing room, accompanied by HPD Sergeant James Guzie and Officers Paul Cohen, Shane Mebane, Jose Contreras, Kelly Baerga, and Shameal Samuels. *Id*. At approximately 12:43 AM on March 15, Plaintiff was being restrained by Officers Baerga and Mebane, who each held one of her arms. *Id.* ¶ 13. While being restrained, Plaintiff "referred to the officers in terms that were critical of their racially biased behavior."[3] *Id.* ¶ 14. Following Plaintiff's statement, Sergeant Guzie struck Plaintiff on her left

---

[3] In her opposition to the instant Motion to Dismiss, Plaintiff clarifies that she "referred to the Defendant officers, including Sgt. Guzie, in racially derogatory terms." Pl.'s Opp'n, ECF No. 28, at 12.

cheek with his closed right fist, causing her to fall to the floor. *Id.* ¶ 15. While she was on the floor, SGT Guzie "mushed" her head against floor. *Id*. at 5 ¶ 16.

SGT Guzie later characterized the strike as "Hard Hand Control," and indicated that HPD officers were trained to use that technique under circumstances as were present with Plaintiff on March 15. *Id*. ¶ 17.[4] Plaintiff, however, alleges that such conduct was prohibited by HPD policy. *Id*.

After SGT Guzie knocked Plaintiff to the floor, he "dragged" her, "against the repeated vocal admonitions of the other HPD officers" to a holding cell. *Id*. ¶ 18. She remained in the cell overnight without being treated for her injuries, which included "swelling to her left eye and entire left side of her face." *Id*. ¶¶ 19–20. The next morning, she was given ice to put on her face, and went to the emergency room following her release from custody. *Id.* ¶ 21. SGT Guzie was subsequently arrested and criminally charged for this conduct. *Id.* ¶ 22.

In her complaint, Plaintiff referenced a long history of use of excessive force by the HPD "against black and brown people," going back as far as 1969. *Id.* at 3 ¶ 10. As a result of that pattern of excessive force, the city of Hartford "was sued in the case of Cintron v Vaughn and ultimately entered into a consent decree." *Id*. at 3–4 ¶ 11. According to Plaintiff, that consent decree required, among other things, "training and discipline of HPD officers to prevent the continuation of the judicially determined pattern or practice of the using excessive force in apprehending, holding in custody or other treatment of black and brown arrestees, detainees or others in the custody of the HPD." *Id.*

---

[4] The Court construes Plaintiff's use of the date March 16, 2021, in the cited paragraph as a typographical error, and assumes that Plaintiff was referring to March 15, 2021, the date of the alleged use of force incident.

Defendant Thody was, at all relevant times, Chief of the HPD. *Id.* at 3 ¶ 6. Plaintiff alleges that Defendant City of Hartford was, at all times related to the complaint, "responsible for the overall operations of the Hartford Police Department, including training, discipline, and enforcing the terms of the Cintron v. Vaughan Consent Decree." *Id.* at 7. Plaintiff further alleges that all Defendants "acted jointly an [*sic*] in concert with each other," that "[e]ach Defendant had the duty and opportunity to protect the Plaintiff from the unlawful actions of the other Defendants" but they "failed and refused to perform such duty, thereby proximately causing the injuries herein complained of." *Id.* at 3 ¶ 9.

**Discussion**

*Count Twelve: Indemnification*

Conn. Gen. Stat. § 7-465 allows an action for indemnification against a municipality in conjunction with a common-law action against a municipal employee. *See Gaudino v. Town of Hartford*, 87 Conn. App. 353 (2005). The statute abrogates municipal immunity and allows a claim directly against a municipality when brought in conjunction with a claim against the municipal employee, as is the case here. *See id.* But "[s]tatutes that abrogate or modify governmental immunity are to be strictly construed…This rule of construction stems from the basic principle that when a statute is in derogation of common law or creates a liability where formerly none existed, it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of construction." *Tryon v. Town of North Branford,* 58 Conn. App. 702, 720, 755 A.2d 317 (2000). Accordingly, when bringing a claim against a municipality pursuant to § 7-465, a plaintiff must comply with the statutes' prerequisites. *See Gaudino,* 87 Conn. App. At 356; *see also*, *Spears v. Garcia,* 66 Conn. App. 669, 680 (2001), *aff'd*,

4

263 Conn. 22, 818 A.2d 37 (2003) (finding that a party may rely on § 7-465 if they meet the requirements therein.).

Section 7-465 provides in relevant part:

> No action for personal physical injuries or damages to real or personal property shall be maintained against such municipality and employee jointly unless such action is commenced within two years after the cause of action therefor arose *and written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued.*

Conn. Gen. Stat. § 7-465(a) (emphasis added). Here, Defendant City asserts, and Plaintiff does not dispute, that Plaintiff did not comply with any of these procedures. Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem."), ECF No. 25-1 at 20; Pl.'s Opp'n, ECF No. 28 at 14. Accordingly, Plaintiff's claim for municipal indemnification under § 7-465 fails. *See, e.g.*, *Gaudino*, 87 Conn. App. at 358 (finding summary judgment proper where plaintiffs brought claims under § 7-465 but did not bring an action against any employees, as required by the statute). The motion to dismiss count twelve is granted.

*Count One: Excessive Force – US Constitution*

Plaintiff alleges that Defendants violated her Fourth Amendment rights, as incorporated against the states by the Fourteenth Amendment, *see Tenenbaum v. Williams*, 193 F.3d 581, 602 n.14 (2d Cir. 1999), by their excessive use of force while Plaintiff was in HPD custody on March 14–15, 2021.[5] "The Fourth Amendment prohibits the use of unreasonable and therefore excessive

---

[5] Plaintiff brings this claim under the Fourth Amendment, but only specifies that Plaintiff "was in the custody of HPD and being held in the processing room…" at the time of the conduct at issue. SAC at 4 ¶ 12. Plaintiff's custodial status, which Plaintiff does not recite with specificity, determines which constitutional provision governs her excessive force claims. *See Quint v. Dunaj*, No. 3:02CV2053(AVC)(TPS), 2006 WL 167563, at *6 (D. Conn. Jan. 20, 2006). ("The continuum from arrest through incarceration is divided into three sections with different constitutional provisions governing claims arising in each section: the period of arrest and custody prior to arraignment is governed by the Fourth Amendment; the pretrial detention period between arraignment and conviction is governed by the Due Process Clause of the Fourteenth Amendment; and the time after conviction is governed by the Eighth Amendment.") The Supreme Court in *Graham v. Connor*, 490 U.S. 386, 395 (1989) held that "*all* claims that law enforcement officers have used excessive force… in the course of an arrest, investigatory

force by a police officer in the course of effecting an arrest." *Jamison v. Metz*, 541 F. App'x 15, 19 (2d Cir. 2013) (summary order) (internal quotation marks omitted). "A police officer violates the Fourth Amendment if the amount of force he uses in effectuating an arrest is objectively unreasonable in light of the facts and circumstances confronting the officer." *Lennox v. Miller*, 968 F.3d 150, 155 (2d Cir. 2020) (internal quotation marks and alterations omitted).

### Municipal Liability

Plaintiff brings her Fourth Amendment excessive force claim pursuant to 42 U.S.C. § 1983. In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (internal quotation marks and citation omitted).

Claims against municipalities are considered under the standard established in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court determined that "[l]ocal governing bodies…can be sued directly under [42 U.S.C.] § 1983 for monetary,

---

stop, or other 'seizure'… should be analyzed under the Fourth Amendment and its 'reasonableness' standard." (emphasis in original). The Court declined to answer, "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." *Id.* n. 10. The Second Circuit has since clarified that, with respect to excessive force claims, "the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer." *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989). Although not entirely clear, the Court draws the reasonable inference that the events occurred post-arrest and pre-arraignment and therefore analyzes the claims under the Fourth Amendment.

declaratory, or injunctive relief where…the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. The Court first held that municipalities were "persons" within the meaning of § 1983. It then found that the language of § 1983, which provides that "[e]very person who…subjects, or causes to be subjected, any…person…to the deprivation of rights…secured by the Constitution…shall be liable to the party injured," requires a causal connection between the actions of the municipality itself and the alleged constitutional violation. *See Monell,* 436 U.S. at 691–92**. "Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees."** *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (emphasis added).

Significant here, a "municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.*" Monell* 436 U.S. at 691 (emphasis in original). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Some courts have identified four ways that a plaintiff may demonstrate a government "policy or custom": "by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *Gomez v. City of Norwalk*, No. 3:15-CV-

7

01434 (MPS), 2017 WL 3033322, at *3 (D. Conn. July 17, 2017) (citing *Aquino v. City of N.Y.*, No. 1:16-CV-1577, 2017 WL 384354, at *3 (S.D.N.Y. Jan. 25, 2017)).

When a plaintiff relies upon a city employee's single tortious decision, the court's inquiry focuses on whether the "actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am.* 361 F.3d at 126. Such an action provides a basis for municipal liability where it is "taken by, or is attributable to, one of the city's authorized policymakers." *Id.* In other words, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122–23 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.") Finally, a municipal policy cannot generally be gleaned from a single incident. See *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy[.]").

Plaintiff acknowledges that her claim arises out of the single instance involving her arrest on March 14–15, 2021. However, Plaintiff argues that she has sufficiently alleged that her treatment was the result of a custom, policy or practice of the HPD. In this vein, Plaintiff alleges, without specificity, a history on the part of the HPD of repeated uses of excessive force against people of color. She cites to the filing of *Cintron v. Vaughn* in 1969, a civil action in which plaintiffs alleged, among other things, the repeated use of excessive force against people of color by the HPD. Plaintiff alleges that this lawsuit resulted in a Consent Decree, "to prevent the

8

continuation of the judicially determined[6] pattern or practice of using excessive force." SAC at 3–4 ¶ 11. The Defendants argues that Plaintiff's allegations are wholly conclusory, and that the *Cintron* case is irrelevant. The Court agrees with the Defendants.

First, allegations that HPD officers used excessive force against people of color *over 50 years ago* do not support a finding that in 2021, the HPD had a practice, custom or policy of using excessive force against people of color. Second, to the extent the Consent Decree has any bearing on the sufficiency of the Second Amended Complaint, which is a dubious proposition, the agreement itself establishes the opposite of that for which it is cited. The Settlement Stipulation reached in 1973 establishes that "The Hartford Police Department will comply with all Federal and State laws as set forth in statute and case law regarding the … use of reasonable physical force." Def.'s Opp'n to Mot. for Contempt, *Cintron v. Vaughn*, No. 3:69-cv-13578-KAD, ECF No. 279 at 34. Thus, as of the date of the so-called Consent Decree, it was the policy of the HPD *not* to use excessive force. Indeed, Plaintiff herself alleges that Sgt. Guzie's conduct violated HPD policy. SAC at 5 ¶ 17. Absent factual allegations that sufficiently establish that in 2021, the HPD had an actual custom or practice of using excessive force, the *Monell* claim is not adequately pled, and the existence of or allegations in the *Cintron* litigation do not fill that void.[7] And although Chief Thody may have sufficient authority as to be considered a "policy maker" for purposes of *Monell* liability, as he was not involved in the arrest and detention of Plaintiff, his authority cannot be cited to establish *Monell* liability. *See Dingwell v. Cossette*, No. 3:17-CV-01531 (KAD), 2020 WL 5820363, at *11–12 (D. Conn. Sept. 30, 2020) (Summary judgment on *Monell* claims against

---

[6] The Court takes judicial notice of the court file in the matter of *Cintron v. Vaughn*, Case No. 3:69-cv-13578 (KAD). The Court is not aware of any judicial determination (as is alleged by Plaintiff) that the HPD engaged in a pattern or practice of using excessive force against people of color. The case was settled without plaintiffs' claims therein being adjudicated by the Court.

[7] To hold otherwise would mean that every alleged use of excessive force by any member of the HPD, even a single isolated occurrence, would give rise to municipal liability. Such a determination is precluded under the well-established rule of *Monell* that municipal liability cannot be premised on *respondeat superior.*

City of Meriden denied where police chief allegedly violated plaintiff's First Amendment rights by blocking him from the police department's Facebook page.).

A municipality may also face *Monell* liability when it fails to act. "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). If a municipality fails to train its subordinates, that failure can satisfy *Monell's* policy or custom requirement, "where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989)). Courts have extended the deliberate indifference standard beyond failure to train to other theories of *Monell* liability, such as failure to supervise and failure to discipline. *Id.* Here, Plaintiff alleges that Chief Thody "failed to train and/or discipline HPD officers in the proper use of force," and that the City failed to "properly oversee the conduct of HPD officers." SAC at 6 ¶ 25.[8]

To sustain these *Monell* claims Plaintiff must allege sufficient factual content for the court to infer that the City and Chief Thody's failures evinced "deliberate indifference" to Plaintiff's constitutional rights. Defendants argue that Plaintiff has not plausibly pled any facts showing that any alleged deficiencies in their training or supervision of HPD officers rose to the level of deliberate indifference. Def.s' Mem at 11. The Court agrees.

---

[8] As Defendants note in their Motion to Dismiss, "[a] claim against a municipal officer in his official capacity is, in essence, a claim against the city." *Mayo v. Doe*, No. 3:19-CV-781 (VAB), 2020 WL 4818360 (D. Conn. Aug. 17, 2020). Therefore, the allegations as to Chief Thody's conduct are part and parcel of the *Monell* claim and are not separate or distinct bases for establishing his liability to Plaintiff.

Deliberate indifference is "a stringent standard of fault" and "depends on a careful assessment of the facts at issue in a particular case." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Id*.

To establish that a failure to train constitutes deliberate indifference, a plaintiff must adequately plead that (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992). For liability to attach the need for training must be obvious, which may be "demonstrated by proof of repeated complaints of civil rights violations," from which a court may infer deliberate indifference "if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Rogoz v. City of Hartford*, No. 3:11CV00500 VLB, 2012 WL 4372189, at *4 (D. Conn. Sept. 24, 2012) (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

In this vein, since *Twombly* and *Iqbal*, courts in this circuit "have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train." *Simms v. The City of New York*, No. 10-CV-3420 NGG RML, 2011 WL 4543051, at *2 (E.D.N.Y. Sept. 28, 2011), *aff'd sub nom. Simms v. City of New York*, 480 F. App'x 627 (2d Cir. 2012); *see also Tieman v. City of Newburgh*, No. 13-CV-4178 KMK, 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015) ("To allege a failure to train claim, a plaintiff must

11

plausibly allege a specific deficiency in the municipality's training."); *Boyd v. Larregui*, No. 3:19-CV-579(CSH), 2020 WL 5820491, at *6 (D. Conn. Sept. 30, 2020) ("The plaintiff must also point to a specific deficiency within the training program and cannot allege a general lack of training or that more or better training would have caused the situation to be avoided. (internal citations omitted)). To state a claim for failure to train under *Monell*, Plaintiff must therefore "allege facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman*, 2015 WL 1379652, at *22.

Plaintiff's Second Amended Complaint makes only general and wholly conclusory allegations regarding HPD training, alleging that the *Cintron* consent decree required "training and discipline" to prevent the use of excessive force, and that Chief Thody's failure to train continued the "pattern or practice of the use of excessive force." SAC at 4 ¶ 11; at 6 ¶ 25.[9] These vague allegations are insufficient to sustain her claim. *See Johnson v. City of New York*, No. 06 CV 09426, 2011 WL 666161, at *4 (S.D.N.Y. Feb. 15, 2011) (dismissing a claim for failure to train where "[t]he Complaint contains only an unsupported conclusory allegation that the City failed to train the individual Defendants…"); *see also Boyd*, 2020 WL 5820491, at *7 (Dismissing failure to train claim where plaintiff generally alleged that the officer in question was not trained, "asserting by implication that his behavior… evidences a lack of training," and noting that "such allegations have been repeatedly held insufficient to state a plausible failure to train claim.").

---

[9] As observed above, Plaintiff does allege that Sgt. Guzie "claimed falsely that HPD officers were trained to use what he described as 'Hard Hand Control' under circumstances as were present on March 16, 2021… while in fact such conduct by Sgt. Guzie was in violation of HPD Policy 3.01 Use of Force – General Section II." SAC at 5 ¶ 17. This allegation undermines Plaintiff's failure to train argument, by implying that by striking Plaintiff in the manner alleged, Sgt. Guzie was acting contrary to his training and *against* HPD policy. The Court construes Plaintiff's use of the date March 16, 2021, as a typographical error, and assumes that Plaintiff was referring to March 15, 2021, the date of the alleged use of force incident.

Plaintiff's *Monell* claim against Chief Thody and the City premised upon a failure to train is dismissed.

To state a claim for failure to supervise, a plaintiff must allege sufficient facts to allow the court to infer that "(1) that defendants 'should have known their inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference'; that (2) there were 'obvious and severe deficiencies in the ... defendants' supervision that reflect a purposeful rather than negligent course of action'; and (3) that there was 'a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs.'" *Riccio v. Town of Old Saybrook*, No. 3:21-CV-821 (SVN), 2022 WL 4585650, at *3 (D. Conn. Sept. 29, 2022) (citing *Reynolds*, 506 F.3d at 193). The only fact plead by Plaintiff to show that Chief Thody and the City were on notice that inadequate supervision would likely result in the use of excessive force against her is the HPD's alleged "pattern or practice of using excessive force" which she claims dates back to 1969. SAC at 3 ¶ 10. Her only support for this "pattern or practice" is the *Cintron* consent decree. Plaintiff does not specifically reference any prior "complaints of civil rights violations that would have put defendants on notice about the propensity of their officers [or these officers in particular] to engage in the kind of misconduct alleged by plaintiff here." *Pierce v. Town of Simsbury*, No. 3:20-CV-01766 (VAB), 2022 WL 4291389, at *5 (D. Conn. Sept. 16, 2022). For the reasons discussed above, citing the *Cintron* litigation, without more, does not provide the "factual amplification" necessary to render the failure to supervise claim plausible under *Twombly* and *Iqbal*. *Id*. (citing *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Even if Plaintiff had referenced specific allegations of prior excessive force by HPD officers, she would need to plead further facts showing that Defendants were deliberately indifferent to them. *See Tieman* 2015 WL 1379652, at *21 ("However, an allegation of numerous

13

claims of excessive force by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." (internal citations omitted)). To meet the deliberate indifference standard, plaintiffs must allege that "meaningful attempts to investigate repeated claims of excessive force are absent." *Hart v. City of Binghamton*, No. 3:10-CV-1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012).[10] Plaintiff failed to do so. She similarly failed to allege that there were any "obvious and severe" supervisory deficiencies related to Sgt. Guzie or the other officers named in her complaint.[11] Because she did not adequately plead a failure to supervise under the first two *Reynolds* prongs, she cannot meet the third prong, which requires a causal relationship between the failure to supervise and the deprivation she suffered.

For the above reasons, Plaintiff has failed to plausibly allege that her Fourth Amendment rights were violated as a result of municipal "policy or custom" as required for liability under *Monell*, either through actions taken by policymakers, a formal policy, widespread practice, or failure to train or supervise. Plaintiff's Fourth Amendment claims in Count One, brought pursuant to § 1983, are dismissed as to Defendants Chief Thody and the City of Hartford.

*Count Two: 42 U.S.C. Section 1981*

---

[10] Plaintiff states, in her opposition to Defendants' Motion to Dismiss, that "Sgt. Guzie was reportedly arrested twice in a month in August, 2018 in connection with a felony arrest as a result of a violation of a protective order, a felony, and an assault against his estranged wife," and that "[w]hile he was not the chief at that time, Chief Thody was a member of HPD and certainly knew of Sgt. Guzie's past violent behavior and obvious need for discipline and training with respect to the use of force." Pl.'s Opp'n at 7. The Court may not consider this information, as it was raised for the first time in Plaintiff's Opposition to Defendants' Motion to Dismiss. *See Arias v. East Hartford*, No. 3:20-CV-00895 (JCH), 2021 WL 3268846, at *9 n. 5 (D. Conn. July 30, 2021) ("It is well established that in reviewing the Motion to Dismiss, the court in this instance may consider only the allegations in the complaint. Plaintiffs may not amend their Complaint or add additional factual allegations through their memorandum in opposition to the Motion to Dismiss." (internal citations omitted)).

[11] In her complaint, Plaintiff alleges that Sgt. Guzie was "arrested and criminally charged due his closed fist punch to the face of the Plaintiff on March 15, 2021" and that he applied for and was granted Accelerated Rehabilitation, presumably by a Judge of the Superior Court. SAC at 4–6 ¶¶ 22–23. The fact that Sgt. Guzie was arrested and prosecuted for his actions undermines any inference that the City was "deliberately indifferent" to Plaintiff's constitutional rights in supervising him.

In Count Two, Plaintiff alleges that Chief Thody "through his failure to train and/or discipline HPD officers," and the City "in failing to properly oversee the conduct of HPD officers," denied her, a black person, the "full and equal benefit of all laws that protect citizens who are not black or brown from the use of excessive force by members of the HPD." SAC at 7 ¶ 29. Plaintiff alleges that Defendants' conduct constituted a violation of 42 U.S.C. § 1981.

Section 1981 states, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. To state a claim under § 1981, "plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, New York, 221 F.3d 329, 339 (2d Cir. 2000). However, in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–736 (1989), the Supreme Court held that "the express 'action at law' provided by § 1983… provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor," and that "[t]hus to prevail on his claim for damages against the school district, petitioner must show that the violation of his [right] protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases."[12]

---

[12] § 1981 was amended by Congress in 1991, adding subsections (b) and (c). Subsection (c) reads "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." In 2018 the Second Circuit joined all other circuits to rule on the issue, except the Ninth, in holding that the new section did not overturn *Jett*. See *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018).

Therefore, "§ 1981 does not provide a separate private right of action against state actors." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). If Plaintiff "seeks to vindicate any independent rights under § 1981, she must do so via claims pursuant to § 1983." *Blythe v. City of New York*, 963 F. Supp. 2d 158, 171 (E.D.N.Y. 2013) (collecting cases). Although pled as a standalone claim under § 1981, the Court will review the claim as if it had been brought pursuant to § 1983.

Defendants move to dismiss this claim on the same grounds as Count One: that Plaintiff failed to adequately plead that her Fourteenth Amendment[13] rights were violated due to a custom, practice, or policy of the City as required under *Monell*. Defs.' Mem. at 14. In response, Plaintiff argues again that the *Cintron* consent decree demonstrates the HPD's history of using excessive force against people of color, and that this history shows "a facially neutral law or policy that has been applied in an intentionally discriminatory manner." Pl.'s Opp'n at 12. The Court again agrees with the Defendants.

As discussed above, general allegations of the HPD's alleged history of misconduct, based solely on the *Cintron* litigation, is insufficient to establish municipal liability under *Monell*. And Plaintiff has not plausibly alleged that in 2021, the HPD had a custom or practice of violating either § 1981 or the Fourteenth Amendment rights of people of color. To the extent she brings these claims premised on deficiencies in the HPD's training or supervision of its officers, this claim fails for the reasons discussed above. Thus, Plaintiff has failed to plausibly allege that her Fourteenth Amendment rights or her rights protected under § 1981 were violated as a result of

---

[13] Oddly, both Defendants in their motion to dismiss and Plaintiff in her Opposition analyze this count as an Equal Protection claim under the Fourteenth Amendment. *See* Defs.' Mem. at 13–14; Pl.'s Opp'n at 11. Count Two makes no mention of the Fourteenth Amendment. However, whether premised upon Section 1981 or the Fourteenth Amendment, the requisites for *Monell* liability are the same and are discussed above.

municipal policy or custom. Her claims in Count Two against Defendants Chief Thody and the City of Hartford are dismissed.

*Count 7: Excessive Force under the Connecticut Constitution*

In Count Seven, Plaintiff alleges that "All Defendants" violated Article First, Section 1 ("Equality of Rights") and Article First, Section 20 ("Equal Protection") of the Connecticut Constitution. Defendants argue, and Plaintiff concedes, that there is no cognizable claim for damages under those sections of the Connecticut Constitution. *See, e.g., Minto v. Dep't of Mental Health & Addiction Servs.*, No. HHDCV176076730S, 2018 WL 710124, at *9 (Conn. Super. Ct. Jan. 11, 2018) ("Connecticut courts have unanimously declined to recognize a private cause of action under article first, § 20"); *Crowley v. Town of Enfield*, No. 3:14 cv 01903 (MPS), 2015 WL 4162435, at *3 (D. Conn. July 9, 2015) (declining to recognize a private right of action under Article First, §§ 8 and 20); *Traylor v. Hammond*, 94 F. Supp. 3d 203, 222 (D. Conn. 2015) ("Given that Traylor raises novel and undeveloped issues of state law, and out of the deference owed to the State as the final arbiter of its own Constitution, the court, in its discretion, declines to exercise supplemental jurisdiction over the claims against Keating and New London under [Article. First, §§ 1, 20 of] the Connecticut Constitution.").

Notwithstanding, Plaintiff contends that because she seeks not just damages but equitable relief, a private right of action is available. She cites no direct authority for this proposition and at least one Superior Court has held to the contrary. *See Blue v. Carbonaro*, No. CV146015705S, 2015 WL 3555294, at *22 (Conn. Super. Ct. May 11, 2015). Absent sufficient guidance from Connecticut courts, the Court declines to exercise supplemental jurisdiction over this claim insofar as it raises new and undeveloped issues under state law. *See* 28 U.S.C. § 1367(c)(1) ("The district

courts may decline to exercise supplemental jurisdiction over a claim" that "raised a novel or complex issue of State Law....").

Insofar as the Court has dismissed both federal claims against the City and Chief Thody, the Court declines to exercise supplemental jurisdiction over not only the claims brought pursuant to the Connecticut Constitution, but also the remaining state law claims—negligent infliction of emotional distress and intentional infliction of emotional distress.

**Conclusion**

The City's and Chief Thody's motion to dismiss is granted in all respects. The clerk of the Court is directed to terminate these Defendants.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of March 2024.

                                                */s/ Kari A. Dooley*
                                                KARI A. DOOLEY
                                                UNITED STATES DISTRICT JUDGE